UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENNETH HILL, | No. 2:11-cv-3409-EFB P |
| Plaintiff, | |
| v. | |
| DIRECTOR OF CORRECTIONS, et al., | ORDER AND FINDINGS AND RECOMMENDATIONS[1] |
| Defendants. | |

Plaintiff is a state prisoner proceeding without counsel in an action brought under 42 U.S.C. § 1983. He alleges Eighth Amendment claims of deliberate indifference to serious medical needs against defendants Bal, Duc, and Menon. Defendants have filed a motion for summary judgment. ECF No. 47. Plaintiff filed an opposition to defendants' motion, ECF No. 49, and defendants filed a reply, ECF No. 50.[2] For the reasons that follow, defendants' motion for summary judgment should be granted.

---

[1] Defendants did not respond to the court's order directing them to complete and return the form indicating either their consent to jurisdiction of the magistrate judge or request for reassignment to a district judge. Accordingly, the clerk will be directed to randomly assign this case to a district judge.

[2] Plaintiff subsequently filed a reply to defendants' reply. ECF No. 51. Neither the Federal Rules of Civil Procedure nor the court's Local Rules provide for such a filing, nor did the court authorize the surreply and it will not be considered in resolving this motion.

1

I.  **BACKGROUND**[3]

Almost immediately upon his arrival at California State Prison-Sacramento (CSP-Sacramento) in March 2004, plaintiff met with Duc, a doctor at the prison. Pl.'s Dep. 21:1-3, 29:1-11. Thereafter, plaintiff and Duc met every two weeks. *Id.* at 30:10-13. At some point in 2004, Duc diagnosed plaintiff with an enlarged prostate, prescribed Flomax, and ordered a prostate-specific antigen (PSA) test. *Id.* at 37:13-23, 38:12-23.[4] An August 2004 PSA test indicated a PSA level of 5.3 ng/mL. *Id.* at 38:24-39:4.[5] In April 2006, Duc referred plaintiff to the U.C. Davis Urology Department (UCD-UD). *Id.* at 40:3-12.[6] An April 20, 2006 consultation report from UCD-UD describes plaintiff's urinary complaints, attributes them to "benign prostatic hyperplasia," and outlines a treatment plan (which includes a prescription for Flomax). ECF No. 48-6 at 9. Duc was plaintiff's primary treating physician from the time plaintiff arrived at CSP-

---

[3] The following statement of facts are based on the allegations in plaintiff's complaint, ECF No. 1 ("Compl."), the portions of plaintiff's July 24, 2014 deposition transcript that defendants submitted in support of their motion for summary judgment, ECF No. 48-9 ("Pl.'s Dep."), and plaintiff's discovery responses, ECF Nos. 48-1, 48-5, 48-6.

[4] Plaintiff's deposition testimony suggests Duc's diagnosis, prescription, and order occurred shortly after his arrival at CSP-Sacramento. *See* Pl.'s Dep. 37:16-19 ("When I got there in 2004 . . . that's what he prescribed.")

[5] Defendants submitted the declaration of non-party J. Bradley Taylor, a medical doctor that specializes in urology. According to Taylor:

> PSA (prostate specific antigen) is a protein produced only in the prostate gland. It is then secreted normally by the prostate gland into the seminal fluid. It's [sic] purpose is to liquefy the ejaculate and therefore, PSA is normally found in the blood in only very small amounts. The elevation of PSA in the blood can represent a non-specific inflammation or abnormality of the prostate gland including inflammation, irritation, benign growth or cancer. All of these conditions allow the PSA protein to get into the blood in elevated amounts. . . . [T]he normal amount of PSA in the blood is less than 4.0 ng/ml.

ECF No. 47-4 at ¶ 5. Plaintiff does not appear to dispute Taylor's explanation.

[6] Although plaintiff could not remember exactly when, he also met with a urologist from San Diego sometime in 2004. Pl.'s Dep. 82:21-25. Plaintiff does not remember whether it was Duc or another prison doctor that made the referral to that urologist. *Id.* at 84:13-20.

2

Sacramento in March 2004 until sometime in 2006, when Menon became plaintiff's primary physician. Pl.'s Dep. 50:3-9, 51:1-18.

PSA tests from June 2005, August 2005, September 2005, December 2005, and March 2006 indicated that plaintiff's PSA level exceeded the normal 4 ng/mL. *See* ECF No. 48-5 at 21-26. On June 26, 2007 and September 7, 2007, Menon informed plaintiff that his PSA levels were still elevated. Pl.'s Dep. 53:8-13. On September 27, 2007, plaintiff's PSA level was 8.4 ng/mL. Compl. at 4. A September 27, 2007 letter from UCD-UD to Duc attributed plaintiff's elevated PSA level to "obstructive voiding." ECF No. 48-6 at 3. Menon "sent [plaintiff] back" to UCD-UD on November 27, 2007. Pl.'s Dep. 53:14-17. The UCD-UD tests indicated bladder outlet obstruction. *Id.* at 53:14-16. Menon later prescribed plaintiff morphine and methadone for pain related to his prostate and bladder. *Id.* at 97:20-25.

A March 2008 clinic note from UCD-UD states that a biopsy was performed on March 6, 2008. ECF No. 48-6 at 5. The result of that biopsy indicated prostate cancer. *Id.* at 5, 6. On March 20, 2008, a urologist from UCD-UD informed plaintiff of the diagnosis and discussed treatment options. *Id.* at 6. On June 18, 2008, plaintiff underwent a robotic-assisted laparscopic radical prostatectomy at UCD-UD. *Id.* at 7.

On March 25, 2008—after plaintiff learned of the diagnosis but before his prostatectomy—plaintiff submitted an inmate administrative appeal. ECF No. 48-5 at 10. In that appeal, plaintiff stated that he had been complaining of urinary problems since the early 2000s, expressed dissatisfaction with the delay in ordering a biopsy, and requested that the surgery take place as soon as possible. *Id.* Plaintiff also claimed that physicians at the U.C. Davis Medical Center informed him that "it took many years for the cancer to be in such a[n] advanced state." *Id.* at 12.

The First Level Appeal Decision, which bears Menon's signature and is dated July 22, 2008, partially granted plaintiff's appeal. *Id.* at 13-14. That decision explained that plaintiff's "request to have surgery is granted in that on June 18, 2008, a robotic prostatectomy was performed at UC-Davis Medical Center." *Id.* at 13. The decision also notes that Menon interviewed plaintiff on June 26, 2008. *Id.*

The Second Level Appeal Response, dated September 2, 2008 also partially granted plaintiff's appeal. *Id.* at 15. Although that response was signed by Bal, the text indicates that Duc reviewed the matter on behalf of Bal. *Id.* at 16-17. The response states that plaintiff was given proper imaging studies with a CT scan, that plaintiff was referred to UCD-UD, and that the urologists ordered extensive testing including biopsy of the prostate to arrive at the diagnosis of cancer. *Id.* at 16.

Plaintiff appealed the Second Level Appeal Response, and, on August 3, 2009, the CDCR issued a Director's Level Decision. *Id.* at 18-20. That decision indicated that a review of plaintiff's Unit Health Record revealed the following:

> You received five UCDMC Urology Clinic evaluations between April 2006 and November 2007 related to urinary symptoms.
>
> Your Prostate Specific Antigen (PSA) (prostate test) level was elevated on June 26 and September 7, 2007. Notation from a urology evaluation on November 27, 2007, indicated a bladder outlet obstruction with a report of an increased PSA.
>
> A CT scan of your abdomen/pelvis was completed on January 8, 2008; the results were unchanged from a previous study completed in April 2006, which showed a small, stable left inguinal hernia; and your prostate was noted as normal.
>
> You had a needle biopsy of the prostate on March 6, 2008; the results revealed adenocarcinoma (prostate cancer).
>
> . . .
>
> You were scheduled to have prostate surgery on May 2, 2008; however, the surgery was cancelled because you had eaten after midnight. Although you signed a consent form acknowledging you should not eat the night before surgery, it was not clear of the California State Prison, Sacramento (SAC) staff notified you that your surgery was to happen on this date or if the medical orders were given not to feed you the night before the surgery.
>
> You received an evaluation on May 27, 2008; documentation indicated your surgery would be rescheduled; and you were given Methadone for pain.
>
> You had a robotic prostatectomy at the UCDMC on June 18, 2008.

*Id.* at 19. The Director's Level Decision denied plaintiff's appeal, finding that despite the "delay . . . in obtaining the prostate biopsy," plaintiff received appropriate care. *Id.* at 20.

Bal, the Chief Medical Officer at CSP-Sacramento, was not one of plaintiff's treating physicians. Pl.'s Dep. 54:14-25. However, sometime between March 2008 and June 18, 2008, Bal interviewed plaintiff about plaintiff's administrative appeal. *Id.* at 55:1-10, 58:22-59:1.

Plaintiff claims that "[b]y the time defendants decided to treat plaintiff the cancer was at an advanced stage." Compl. at 2. According to plaintiff, defendants' "failure to treat plaintiff for prostate cancer . . . resulted in his inability to bear children[] and [having] to wear[] a diaper bag . . . ." *Id.* at 3; *see also* ECF No. 48-1 at 8 (alleging additional consequences).

On September 24, 2012, the court screened plaintiff's complaint pursuant to 28 U.S.C. § 1915A and found that it stated cognizable Eighth Amendment deliberate indifference claims against Bal, Duc, and Menon. ECF No. 6.[7]

## II.  STANDARDS

### A.  Summary Judgment

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment avoids unnecessary trials in cases in which the parties do not dispute the facts relevant to the determination of the issues in the case, or in which there is insufficient evidence for a jury to determine those facts in favor of the nonmovant. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986); *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994). At bottom, a summary judgment motion asks whether the evidence presents a sufficient disagreement to require submission to a jury.

The principal purpose of Rule 56 is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thus, the rule functions to

---

[7] The court also found that the complaint did not state cognizable claims against defendants U.C. Davis, Walker, or the Director of Corrections. *Id.* On October 29, 2012, plaintiff submitted documents with the court indicating his desire to proceed with the claims in the original complaint against defendants Bal, Duc, and Menon. ECF No. 9.

5

1 "'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for
2 trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)
3 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments). Procedurally,
4 under summary judgment practice, the moving party bears the initial responsibility of presenting
5 the basis for its motion and identifying those portions of the record, together with affidavits, if
6 any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477
7 U.S. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). If the moving
8 party meets its burden with a properly supported motion, the burden then shifts to the opposing
9 party to present specific facts that show there is a genuine issue for trial. Fed. R. Civ. P. 56(e);
10 *Anderson,* 477 U.S. at 248; *Auvil v. CBS "60 Minutes"*, 67 F.3d 816, 819 (9th Cir. 1995).

11 A clear focus on where the burden of proof lies as to the factual issue in question is crucial
12 to summary judgment procedures. Depending on which party bears that burden, the party seeking
13 summary judgment does not necessarily need to submit any evidence of its own. When the
14 opposing party would have the burden of proof on a dispositive issue at trial, the moving party
15 need not produce evidence which negates the opponent's claim. *See, e.g., Lujan v. National
16 Wildlife Fed'n*, 497 U.S. 871, 885 (1990). Rather, the moving party need only point to matters
17 which demonstrate the absence of a genuine material factual issue. *See Celotex*, 477 U.S. at 323-
18 24 ("[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a
19 summary judgment motion may properly be made in reliance solely on the 'pleadings,
20 depositions, answers to interrogatories, and admissions on file.'"). Indeed, summary judgment
21 should be entered, after adequate time for discovery and upon motion, against a party who fails to
22 make a showing sufficient to establish the existence of an element essential to that party's case,
23 and on which that party will bear the burden of proof at trial. *See id.* at 322. In such a
24 circumstance, summary judgment must be granted, "so long as whatever is before the district
25 court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is
26 satisfied." *Id.* at 323.

27 To defeat summary judgment the opposing party must establish a genuine dispute as to a
28 material issue of fact. This entails two requirements. First, the dispute must be over a fact(s) that

is material, i.e., one that makes a difference in the outcome of the case. *Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). Whether a factual dispute is material is determined by the substantive law applicable for the claim in question. *Id.* If the opposing party is unable to produce evidence sufficient to establish a required element of its claim that party fails in opposing summary judgment. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322.

Second, the dispute must be genuine. In determining whether a factual dispute is genuine the court must again focus on which party bears the burden of proof on the factual issue in question. Where the party opposing summary judgment would bear the burden of proof at trial on the factual issue in dispute, that party must produce evidence sufficient to support its factual claim. Conclusory allegations, unsupported by evidence are insufficient to defeat the motion. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Rather, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts that show there is a genuine issue for trial. *Anderson*, 477 U.S. at 249; *Devereaux*, 263 F.3d at 1076. More significantly, to demonstrate a genuine factual dispute the evidence relied on by the opposing party must be such that a fair-minded jury "could return a verdict for [him] on the evidence presented." *Anderson*, 477 U.S. at 248, 252. Absent any such evidence there simply is no reason for trial.

The court does not determine witness credibility. It believes the opposing party's evidence, and draws inferences most favorably for the opposing party. *See id.* at 249, 255; *Matsushita*, 475 U.S. at 587. Inferences, however, are not drawn out of "thin air," and the proponent must adduce evidence of a factual predicate from which to draw inferences. *American Int'l Group, Inc. v. American Int'l Bank*, 926 F.2d 829, 836 (9th Cir. 1991) (Kozinski, J., dissenting) (citing *Celotex*, 477 U.S. at 322). If reasonable minds could differ on material facts at issue, summary judgment is inappropriate. *See Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). On the other hand, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could

not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).  In that case, the court must grant summary judgment.

### B.    Deliberate Indifference

To succeed on an Eighth Amendment claim predicated on the denial of medical care, a plaintiff must establish that he had a serious medical need and that the defendant's response to that need was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006); *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  A serious medical need exists if the failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain. *Jett*, 439 F.3d at 1096.  Deliberate indifference may be shown by the denial, delay, or intentional interference with medical treatment, or by the way in which medical care is provided. *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988).

To act with deliberate indifference, a prison official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847.  A physician need not fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights. *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989).  A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case. *Id.*

It is important to differentiate common law negligence claims of malpractice from claims predicated on violations of the Eighth Amendment's prohibition of cruel and unusual punishment.  In asserting the latter, "[m]ere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." *Broughton v. Cutter Laboratories*, 622 F.2d 458, 460 (9th Cir. 1980) (citing *Estelle*, 429 U.S. at 105-06); *see also Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004).

/////

## III. ANALYSIS

Defendants argue that they are entitled to judgment as a matter of law because of the insufficiency of plaintiff's evidence. ECF No. 47-3 at 21. As discussed below, plaintiff has failed to make a showing sufficient to establish that Duc, Menon, or Bal acted with deliberate indifference—an element essential to plaintiff's Eighth Amendment claims and on which plaintiff would bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322.[8]

### A. Duc

Plaintiff claims that Duc was deliberately indifferent to his serious needs because Duc misdiagnosed him in 2004 and denied him "the correct treatment in a timely manner." ECF No. 48-1 at 6, 7.

#### 1. Delay in Diagnosis and Treatment

In 2004, Duc diagnosed plaintiff with an enlarged prostate. Plaintiff argues that Duc's diagnosis was incorrect, and that it was actually prostate cancer that was causing plaintiff's urinary issues at that time. *Id.* at 6. The suggestion is that the failure to diagnose cancer in 2004 led to delay in the surgery that was performed four years later on June 18, 2008, after the cancer has become more advanced and required more invasive surgery and more severe complications from the surgery. Specifically, plaintiff claims that Duc delayed in ordering PSA tests and a biopsy, and that his incontinence is a direct result of Duc's delay. ECF No. 48-1 at 6. Indeed, Duc presented August 2004 with both an enlarged prostate and PSA test results indicating an elevated PSA level of 5.3. In light of those indicators, there does not appear to be a clear explanation why Duc did not immediately refer plaintiff to a urologist for evaluation of possible prostate cancer and biopsy. PSA tests throughout 2005 and early 2006 all showed elevated PSA levels. Ultimately, Duc referred plaintiff to the UCD-UD in April 2006. By September 27, 2007, plaintiff's PSA level had climbed to 8.4. A biopsy was finally performed on March 6, 2008, which confirmed prostate cancer. Plaintiff's point appears to be that by then the cancer was more

---

[8] Menon and Bal also argue that they are entitled to qualified immunity. Because the court grants them summary judgment on the merits of plaintiff's deliberate indifference claims, a discussion of qualified immunity is unnecessary.

9

1   advanced, requiring surgery more invasive than would otherwise have been necessary, which
2   resulted in more severe side effects (as plaintiff characterizes it: "his inability to bear children[]
3   and [having] to wear[] a diaper bag."). Compl. at 2 – 3. While delay in treatment that results in
4   harm[9] or unnecessary and wanton infliction of pain can violate the Eighth Amendment, *see*
5   *McGuckin*, 974 F.2d at 1060 (citing *Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404,
6   407 (9th Cir. 1985) (per curiam)); *Hudson v. McMillian*, 503 U.S. 1, 10 (1992), the ultimate test
7   is whether the delay was the product of Duc's deliberate indifference to plaintiff's medical needs.
8   *Farmer v. Brennan*, 511 U.S. at 837, 847; *Ortiz v. City of Imperial*, 884 F.2d at 1314. Assuming
9   a misdiagnosis by Duc and a resulting delay in the diagnosis and treatment, "[m]ere negligence in
10  diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth
11  Amendment rights." *Toguchi*, 391 F.3d at 1057 (quoting *McGuckin v. Smith*, 974 F.2d 1050,
12  1059 (9th Cir. 1992)) (internal quotation marks omitted).

13  The treatment that plaintiff received after Duc referred him to UCD-UD in April 2006
14  suggests that if plaintiff had prostate cancer in 2004, Duc was not deliberately indifferent for
15  failing to diagnose it. The undisputed evidence indicates: (1) on April 20, 2006, a urologist at
16  UCD-UD attributed plaintiff's complaints to "benign prostatic hyperplasia" and outlined a
17  treatment plan that included a prescription for Flomax—the very medication that Duc prescribed
18  in 2004; (2) on September 27, 2007, a urologist at UCD-UD attributed plaintiff's elevated PSA
19  levels to "obstructive voiding"; and (3) it was not until March 6, 2008—nearly two years after
20  Duc referred plaintiff to UCD-UD—that UCD-UD performed the biopsy that indicated plaintiff
21  had prostate cancer. *See also* Pl.'s Dep. 41:19-22 (indicating that the physicians at U.C. Davis
22  had treated and evaluated plaintiff for at least three years before diagnosing him with prostate
23  cancer).
24  /////

---

[9] Defendants submit a declaration from a urologist opining that "[w]hile there was some delay initially in evaluating [plaintiff's] elevated PSA, it had no negative impact on his treatment or outcome." ECF No. 47-4 at ¶ 20. Dr. Taylor elaborates: "the incontinence [plaintiff] experiences was not a product of the timing of his treatment, but rather is a known complication that occurs in the absence of negligence . . . ." *Id.* at ¶ 21. For purposes of this analysis, the court assumes the delay either resulted in harm or unnecessary suffering.

The undisputed evidence indicates that plaintiff received at least six PSA tests between August 2004 and March 2006, and that Duc ordered a test, prescribed Flomax, and referred plaintiff to UCD-UD during plaintiff's first year at CSP-Sacramento. Thus, while medical experts might debate whether it was negligent not to have recommended a biopsy in August of 2004, plaintiff has not produced in opposition to summary judgment evidence that would enable a reasonable jury to find that Duc was not only negligent but was deliberately indifferent to plaintiff's serious medical needs. *Cf. Hughes v. Chenail*, 567 F. App'x 488, 488 (9th Cir. 2014) (affirming grant of summary judgment for defendants and explaining "[a]t most, the evidence that [plaintiff] presented demonstrates that the failure of Drs. Macabuhay and Hegmann to immediately refer [plaintiff] to a liver specialist amounted to negligence.").

**B.     Menon**

Plaintiff claims that Menon was deliberately indifferent to plaintiff's serious medical needs because he "denied plaintiff the correct medical treatment and care from 2004 to 2008." ECF No. 48-3 at 7. Plaintiff has not provided meaningful elaboration on Menon's allegedly deficient treatment. A review of each allegation involving Menon fails to show any indication that he was even negligent let alone indifferent in his care of plaintiff.

According to plaintiff, Menon became plaintiff's primary physician at CSP-Sacramento sometime "around the end of 2006." Pl.'s Dep. 49:24 - 50:3-9, 51:1-18. In June and September 2007, Menon informed plaintiff that his PSA levels were still elevated. *Id.* at 53:8-13. In November 2007, Menon referred plaintiff to UCD-UD. *Id.* at 53:14-17. And, sometime after that referral, Menon prescribed morphine and methadone for plaintiff's pain. *Id.* at 97:20-25. Lastly, Menon interviewed plaintiff on June 26, 2008, and partially granted plaintiff's administrative appeal on July 22, 2008. ECF No. 48-6 at 13-14.

There is no allegation that Menon had any interaction with plaintiff before becoming plaintiff's primary care physician in 2006. *See* Pl.'s Dep. 51:11-17 (stating that there was no overlap of Duc and Menon's treatment, and that Menon was his primary care physician from 2006 to 2008). Menon therefore could not have been deliberately indifferent to plaintiff's serious medical needs from 2004 to 2006. That Menon informed plaintiff of his elevated PSA levels,

referred plaintiff to UCD-UD, and prescribed medication for plaintiff's pain certainly does not rise to an Eighth Amendment violation. Moreover, it is unclear what else Menon could have done with respect to his interview with plaintiff on June 26, 2008 and his partial granting of plaintiff's administrative appeal on July 22, 2008; both of those events occurred after the prostatectomy at UCD-UD.

As previously noted, to survive summary judgment with respect to his claim that he was denied "the correct medical treatment," ECF No. 48-3 at 7, plaintiff must show "that the chosen course of treatment 'was medically unacceptable under the circumstances' and was chosen 'in conscious disregard of an excessive risk to the prisoner's health,'" *Toguchi*, 391 F.3d at 1058 (quoting *Jackson*, 90 F.3d at 332) (internal modifications omitted). Plaintiff has failed to make a showing sufficient to satisfy that standard with respect to Menon's treatment.

Because plaintiff has not made a sufficient showing of Menon's deliberate indifference, Menon's motion for summary judgment should be granted.

**C.     Bal**

Plaintiff claims that Bal "denied plaintiff the correct medical treatment and care from 2004 to 2008." ECF No. 48-2 at 6. He adds that Bal is "responsible for the medical care of all inmates at CSP-[Sacramento]," as well as the supervision and training of Duc and Menon. *Id.* at 7. Given that Bal was not one of plaintiff's treating physicians, Pl.'s Dep. 54:14-25, it appears plaintiff is suing Bal in his capacity as Chief Medical Officer of CSP-Sacramento.[10]

Under § 1983, plaintiff must demonstrate that the defendants holding supervisory positions personally participated in the deprivation of his rights. *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). There is no respondeat superior liability, and each defendant is only liable for his or her own misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). However, liability under § 1983 may be imposed on supervisors if: (1) the supervisor personally participated in the deprivation of constitutional rights, (2) the supervisor knew of the violations and failed to act to

---

[10] Sometime between March 2008 and June 18, 2008, Bal allegedly interviewed plaintiff about plaintiff's administrative appeal for approximately five minutes. *Id.* at 55:1-10, 58:22-59:1, 59:8-11. However, plaintiff does not claim that any constitutional violations occurred as a result of that five-minute interview.

12

prevent them, or (3) the supervisor "implement[ed] a policy so deficient that the policy itself 'is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" *Redman v. Cnty. of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991) (en banc), *abrogated on other grounds by Farmer*, 511 U.S. at 825.

Here, there is no evidence of an underlying constitutional violation which would subject Bal to supervisory liability. *City of Los Angeles v. Heller*, 475 U.S. 796 (1986). Additionally, plaintiff has not even alleged that Bal implemented a policy that was so deficient that the policy itself was a repudiation of the constitutional rights of plaintiff and was the moving force being any alleged violations. Accordingly, Bal is entitled to summary judgment on plaintiff's claims.

## IV.   ORDER AND RECOMMENDATION

Accordingly, IT IS HEREBY ORDERED that the Clerk of the Court shall randomly assign a United States District Judge to this action.

Further, IT IS HEREBY RECOMMENDED that:

1. Defendants' motion for summary judgment (ECF No. 47) be granted;

2. Judgment be entered in defendants' favor; and

3. The Clerk directed to close this case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED: February 12, 2015.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE